755 P.2d 1153
**STATE of Arizona, Appellee,**

v.

**Jeffrey Don ALLEN, Appellant.**

**No. CR–87–0087–PR.**

Supreme Court of Arizona,
En Banc.

June 2, 1988.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellee.

D. Jesse Smith, Tucson, for appellant.

HOLOHAN, Justice.

The defendant, Jeffrey Don Allen, was convicted of one count of child molestation and was sentenced to seven years' imprisonment. He appealed his conviction, but the Court of Appeals affirmed it. *State v. Allen*, 157 Ariz. 163, 755 P.2d 1151 (Ariz. Ct.App., 1987). We granted his petition for review.

## THE ISSUES

On review, the defendant raised two issues: (1) that the trial court erred in ruling that the child victim was unavailable; and (2) that the reception in evidence, without objection, of testimony from experts held inadmissible in *State v. Lindsey*, 149 Ariz. 472, 720 P.2d 73 (1986), and *State v. Moran*, 151 Ariz. 378, 728 P.2d 248 (1986), was fundamental error. Due to our disposition of the first issue, we need not reach the merits of the second.

## THE FACTS

The victim was a six-year-old child named Cara. She did not testify at the trial. All the evidence about the crime charged came

from the testimony of her mother and an investigating police officer.[1]

Cara's life since she was 3 years old had been extremely unpleasant. Her father repeatedly beat her and her mother. Eventually Cara and her mother moved into a women's shelter and her mother sought a divorce. Shortly thereafter, her father kidnapped her and hid from the police until he was arrested. During the period Cara was held by her father they lived in a van with "some girl that he had picked up somewhere along the line." (R.T. of Jan. 15, 1986, at 71).

Both before and after her abduction, Cara was in therapy. The therapists observing Cara at play formed a belief that Cara had been sexually abused by her father.[2]

The defendant is a single male in his mid-twenties. He had no prior criminal history. At the time of trial, he managed his own business and was a licensed realtor associated with a national brokerage firm. He attended Pima College in Tucson where he obtained an Associate Degree in business administration.

The defendant met Cara's mother at a party in the apartment complex where Cara and her mother lived.[3] The defendant and Cara's mother began to socialize and were sexually intimate on at least one occasion. On that occasion Cara was aware that the defendant and her mother had spent the night together.

On April 29, 1985, approximately two weeks after the defendant and Cara's mother had spent the night together, mother and daughter attended a therapy session where a film strip, *Penelope Mouse*, was shown. This film is about a very human mouse who is touched in a private place by her mouse uncle. Penelope Mouse then tells her mother mouse, teachers and counselors, what her uncle did, and they reward her and make her feel good.

On their way home after the session, Cara's mother discussed the film with her daughter. While reiterating the film's message that certain types of touching by a friend or a stranger is wrong and it is permissible to speak up about it, Cara stated "They already did." (R.T. of Jan. 15, 1986, at 25). When asked who, Cara stated "Robbie and Jeff [defendant] did."[4] (*Id.*)

---

1. There was an attempt to videotape testimony of the victim. However, it was aborted due to the child's inability to proceed.

2. This suspicion was subsequently strengthened during a "socialization group," where the children were asked what they were afraid of. The state's expert, one of Cara's therapists, stated on direct examination:

 A ... Cara's response was when people touch you in the wrong places.
 Q Did she make any—say anything additional about who had touched her, anything like that?
 A Okay. At that point she became extremely sad. Her body became real rigid. She put her hands between her legs near her crotch area.
 I asked her at that point if anyone had touched her. And she said: It doesn't happen anymore with Daddy where I used to live.
 Q It doesn't happen anymore with Daddy where I used to live?
 A Uh-huh. And at that time she was away from Dad.
 Q In looking at State's 11, Elaine, that's in a quotation. Is that what Cara told you?
 A Yes.
 Q Did you write that down as what was being said?
 A Yes.
 (R.T. of Jan. 14, 1986, at 8–9).
 Cara also stated at this session that her father would show her "nasty pictures." (R.T. of Jan. 14, 1986, at 33–34, 36). These pictures apparently depicted nude people. As a result of what Cara said in the play evaluation and socialization group concerning her father, Cara was placed in a sexual abuse group.
 Furthermore, unbeknownst to her therapist, Cara was already the subject of a reported incident of molestation. In the spring of 1984, an officer for the Child Protective Services of the Department of Economic Security interviewed Cara as a follow-up to another investigation he was conducting. Cara stated that a boy named "Chris" had tried to kiss her. She also stated that Chris exposed himself and asked her to kiss him on his penis.

3. The defendant did not live in this apartment complex. His apartment was approximately two miles away.

4. The allegations against the individual named "Robbie" are separate and distinct from those against the defendant. Robbie and his wife were neighbors of Cara and her mother. They were responsible for introducing the defendant to the mother.

She then related how the defendant had allegedly molested her on one occasion while baby-sitting.[5]

[The Mother]: [Cara] said that—she said that when he went to his [defendant's] house that he would make her lay down on the bed, his bed, in his bedroom and that he would lock the door, then he would take a shower. He would come out with just a towel around him.

She said that then he would take the towel off and stand in front of her, and that then he would get into the bed with her. And she would be laying on her back and that he would be laying on his side, facing her, and he would rub his penis up against her leg.

. . . .

Q You started to say Jeff would put his penis against her; what else? Please continue.

A Against her leg and she used the term humped. I asked her: What do you mean by humped?

She said: You know, he rubbed up against me and then he peed on my leg. And she said: Then he held me down and he wouldn't let me get down and wash it off. And then she said: Then I got up and the door was locked.

5. Cara's mother testified that the defendant baby-sat Cara on four occasions during December 1984 through January 1985. The defendant disputed the dates and acknowledged only two occasions in which he baby-sat. In either case it is undisputed that the defendant baby-sat Cara.

6. Cara also described the incident with Robbie while in the car that evening. Cara's mother also related this at trial:

What she [Cara] said about Robbie was that Chris [Robbie's wife] and Robbie had picked her up at her daycare, taken her to their house, and then the three of them went to take Chris to work, because Robbie didn't work, Chris did. And then it was just Robbie and Cara came back to the apartment.

And she said then he—they had a foldout couch that folded out into a bed, and it was pretty much always folded out into a bed, and that he had her lay down there and then he laid down with her. He pulled her on top of him, lifted her dress, pulled down her underwear, put his finger up her vagina and moved it. And she made the motion like this indicating moved it inside of her. And it hurt, she

And she couldn't get out of the room.[6] (R.T. of Jan. 10, 1986, at 26; R.T. of Jan. 15, 1986, at 25–26).

When they arrived home, the mother called the defendant and asked him to come over so that she could speak with him. When the defendant replied he was unable to come over, the mother insisted and stated that she wanted to discuss "Something you shouldn't have done to a little girl." (R.T. of Jan. 15, 1986, at 28). The defendant's reply to this statement was "Oh, fuck." (*Id.*) Thereafter Cara's mother reported the matter to the police, and Cara repeated the incident to a police officer.

Cara attended an individual therapy session on May 1, 1985, two days after her conversation with her mother. Cara's therapist congratulated her for her disclosure to her mother and the police. As the session proceeded, Cara drew a picture of a male monster. She placed a hand of the monster on its genitals and described what was occurring in the picture. Besides stating that the monster was "touching" himself, Cara said that the monster "jacks off with his weinie." (R.T. of Jan. 14, 1986, at 11–14; R.T. of Jan. 16, 1986, at 56–57). When asked who the monster was, Cara failed to identify it.[7]

said it hurt. And she had to go to the bathroom and he wouldn't let her get up to go to the bathroom. He was still holding her down on top of him. And then finally he let her get up and go to the bathroom.
(R.T. of Jan. 15, 1986, at 57–58).
Thus, the record discloses at least four different people (Cara's father, Chris (*see* fn. 2, *supra*), Robbie and the defendant) who may have sexually molested Cara.

7. Several weeks later, on May 20, 1985, and during group therapy, Cara drew another picture. This time a different therapist was present. This therapist testified as follows:
Q Can you label some of the people [in the picture]? Did Cara label who some of the objects are in there?
A First she said there was an ugly person and his name was dumb Jeff. First [she] had written dad, crossed that out, then she put Jeff. Then she also labeled it men.
Then I said: Well, could you tell me about this picture?
She said: This is me—and she wrote: Me, Cara, this is Jeff and this is mom and this is the tree.

Prior to trial, the state moved to videotape the child's testimony. The defense made no objection. The trial court granted the motion, but the child was unable to continue the deposition once the questions began to focus on the alleged molestation. At no time, then or afterwards, was the defense able to cross-examine Cara. Thereafter, the state filed a motion to introduce the statements of the child pursuant to A.R.S. § 13–1416 (The Minor Sexual Victim Testimony Act).[8]

At the hearing on this motion, the trial court ruled, without objection from the defense, that the child was unavailable and the statements would be admissible at trial. The trial court based the unavailability ruling solely upon the prosecutor's statement that the child was unable to testify.[9] However, at trial, the state's experts[10] testified that the child had suffered extreme mental anguish and would suffer further adverse effect if made to testify.

The only evidence about the details of the alleged offense came from witnesses who testified about what Cara had told them. Expert testimony was offered to support the child's statements. One expert testified, without objection, that only three percent of reported molestations are false.[11] No objection was raised to this testimony. In response to the prosecutor's question whether the child could be "transferring what had happened to her from somebody else onto to Mr. Allen," another expert witness replied that she did not believe so. (R.T. of Jan. 16, 1986, at 69). This second expert also testified that the child had been molested by her father and "remolested" by the defendant. When asked for the basis of her belief she replied: "The police reports, her sharing of what exactly happened with Jeff and Robbie, the way she was able to verbalize that, her behaviors are real evident." (*Id.*) Again, no objection was made to this testimony.[12] No physical evidence of sexual abuse was presented by the prosecution. The defendant took the stand in his own defense and denied ever having molested the child. The jury found the defendant

(R.T. of Jan. 15, 1986, at 57).

**8.** Prior to being declared unconstitutional by this court in *State v. Robinson,* 153 Ariz. 191, 735 P.2d 801 (1987), the most recent version of the statute stated as follows:

A. A statement made by a minor who is under the age of ten years describing any sexual offense performed with or on the minor by another person or any act of physical abuse of the minor, which is not otherwise admissible by statute or court rule, is admissible in evidence in any criminal or civil proceeding if both of the following are true:

1. The court finds, in an in camera hearing, that the time, content and circumstances of the statement provide sufficient indicia of reliability.

2. Either of the following is true:

(a) the minor testifies at the proceedings.

(b) the minor is unavailable as a witness, provided that if the minor is unavailable as a witness, the statement may be admitted only if there is corroborative evidence of the statement.

B. A statement shall not be admitted under this section unless the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to prepare to meet the statement.

**9.** The trial judge was present at the aborted video tape session where Cara could not answer questions about the incident. Nothing in the record supports the state's contention that the trial judge based his ruling on this and we do not believe that this coupled with the prosecutor's statement would have constituted a sufficient determination if he had. However, for the reasons stated *infra,* we find that the defendant waived this issue by failing to object.

**10.** Both of the state's experts were the therapists at the center where Cara was undergoing therapy. Each had observed Cara in either individual or group sessions.

**11.** At the time of trial, this court's rulings in *State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73 (1986), and *State v. Moran,* 151 Ariz. 378, 728 P.2d 248 (1986), had yet to be rendered condemning this type of testimony.

**12.** It is clear that the expert's opinion that Cara was "remolested" was based on her belief that Cara was telling the truth. As we stated in *Moran, supra,* 151 Ariz. at 382, 728 P.2d 248, "An expert's belief in a witness's credibility 'has never been a permissible subject of expert opinion less [sic] the trial process return to the discredited notion of marshalling adherents of either side as oathtakers.'" (quoting M. Udall & J. Livermore, *Law of Evidence* § 22, at 30–31 (2d ed. 1982)).

guilty, and he was sentenced to the presumptive term of seven years.

## DISCUSSION

The defendant challenges the admission of the child's out-of-court statements contending that there was not an adequate showing that she was unavailable.

 The burden is on the state to prove unavailability when it offers a declarant's out-of-court statements. *State v. Robinson*, 153 Ariz. 191, 203, n. 15, 735 P.2d 801, 813, n. 15 (1987). However, absent fundamental error, the failure to object is a waiver of any error. *State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981).

 In the present case, the trial judge witnessed the child's inability to express herself at the videotaping session. Both the state's experts and the victim's mother testified at trial that Cara was extremely distraught and was unable to discuss the incident any further. Whether the foregoing provided a sufficient basis to support the ruling of the trial court we need not decide [13] because the defendant waived the issue by failing to object.

In the usual case, the rejection of the defendant's grounds for challenging the admission of the hearsay would end the matter. However, we note that while this case was in the appellate review process, we issued our opinion in *Robinson*, holding that A.R.S. § 13–1416 unconstitutionally infringed upon this court's rule-making authority and undermined "fundamental judicial and constitutional values and processes" required in the truth-finding function of criminal trials.[14] *Robinson*, 153 Ariz. at 197, 735 P.2d at 807.

*Robinson* is applicable to the present case since it was pending review when the *Robinson* decision was announced. *State v. Nunez*, 135 Ariz. 257, 258, 660 P.2d 858, 859 (1983). However, the defense counsel never objected to the hearsay statements offered pursuant to A.R.S. § 13–1416. We have held that the rule of waiver is equally applicable even when the error may be of constitutional magnitude. *State v. Magallanes*, 110 Ariz. 235, 517 P.2d 505 (1973) (holding that State's failure to afford defendant proper notice in accordance with procedural due process in a probation revocation could not be raised on appeal absent an objection in the trial court); *State v. Holder*, 155 Ariz. 83, 745 P.2d 141 (1987) (defendant's failure to object to State's use of peremptory challenges on grounds that it violated defendant's right to equal protection resulted in waiver on appeal). If, however, there is fundamental error, no objection is required. We must decide whether admitting the child's hearsay statements in this case constituted fundamental error. *State v. McGann*, 132 Ariz. 296, 298, 645 P.2d 811, 813 (1982).

 Fundamental error is defined as "such error as goes to the foundation of the case or takes from a defendant a right essential to his defense." *State v. Gamble*, 111 Ariz. 25, 26, 523 P.2d 53, 54 (1974). This error must be sufficient to raise concerns that the trial may not have been fair. *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977). Our decision in *Robinson* did not specifically address whether admission of hearsay statements pursuant to A.R.S. § 13–1416 concurrently resulted in fundamental error. Now that issue is squarely before us.

A.R.S. § 13–1416 was unconstitutional for two separate reasons. First, it violated the separation of powers between the legis-

---

**13.** For those courts which have adopted a strict analysis of unavailability, *see State v. Fearing*, 315 N.C. 167, 337 S.E.2d 551 (1985); *State v. Ryan*, 103 Wash.2d 165, 691 P.2d 197 (1984).

**14.** Neither the trial court nor the Court of Appeals had the benefit of *Robinson* at the time this case was before them. Thus, they could not have been expected to act according to its dictates with respect to the hearsay statements made by Cara. This also is true as to the trial

court for *State v. Lindsey* and *State v. Moran, supra,* note 11, decided April 14, 1986 and November 19, 1986, respectively. The Court of Appeals concluded that defendant's failure to object to the particular statements resulted in a waiver and that any error in their admission was not fundamental error. While we agree with the Court of Appeals on the former conclusion we reserve our judgment on the latter conclusion until it is necessary for us to address it.

lature and the courts. Ariz. Const. art. 6, § 5(5); *Robinson*, 153 Ariz. at 197, 735 P.2d at 807. However, *Robinson* was not based solely on the issue of whether the state legislature had transgressed our rule-making authority. As this court stated "... hearsay rules, in conjunction with the confrontation clauses of the state and federal constitutions, go to the heart of the judicial process: they strike a balance between the search for evidence that furthers the truth-finding process and the accused's right to probe the reliability of that evidence through confrontation and cross-examination." *Id.*

 Arizona Rules of Evidence (the Rules), and particularly those concerning hearsay, adopted by this court are designed to protect the constitutional rights of the accused under the confrontation clause of our federal and state constitutions. U.S. Const. amend. VI; *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); Ariz. Const. art. 2, § 24; *State v. Edwards*, 136 Ariz. 177, 665 P.2d 59 (1983). These principles go to the heart of the fact-finding process. In declaring A.R.S. § 13–1416 unconstitutional, we found that it interfered with the careful balance established by the Rules to insure that the trial have reliable evidence which comports with the requirements of the confrontation clause.[15] Accordingly, we held that not only did A.R.S. § 13–1416 impermissibly infringe "on this court's constitutional authority to make procedural rules for the judiciary," it also created a conflict going *"to the very essence of the truth-seeking process* and in cases in which constitutional protections apply." *Robinson*, 153 Ariz. at 198, 735 P.2d at 808 (emphasis added). Hence, A.R.S. § 13–1416 created situations

whereby evidence was admitted which significantly undermined "... the integrity of the fact-finding process ..." and created "... a clear danger of convicting the innocent." *State v. Stenrud*, 113 Ariz. 327, 328, 553 P.2d 1201, 1202 (1976).[16]

In light of the circumstances of this case, unless the hearsay statements were admissible under some recognized exception, the admission would constitute fundamental error because the statements were the only evidence of the details of the crime presented against the defendant. If not properly admitted, there was no competent evidence to convict the defendant. As we stated in *McGann:*

> The majority rule is that if hearsay evidence is admitted without objection, it becomes competent evidence admissible for all purposes. Annot., 79 A.L.R.2d 890, § 3 (1961). This is the rule in Arizona. *State v. Tafoya*, 104 Ariz. 424, 454 P.2d 569 (1969). But when hearsay evidence is admitted without objection, it is not conclusive proof of the matter for which it was offered. *State v. Baca*, 83 N.M. 184, 489 P.2d 1182, 1183 (Ct.App. 1971). When hearsay evidence is the sole proof of an essential element of the state's case, reversal of the conviction may be warranted. *See People v. Hines*, 12 Ill.App.3d 582, 299 N.E.2d 581 (1973); *State v. Baca, supra;* Annot., 79 A.L.R. 2d 890, § 24 (1961). In Arizona, if the admission of hearsay evidence amounts to fundamental error in a criminal case, we will reverse even if the defendant has failed to object to its admission.

132 Ariz. at 299, 645 P.2d at 814.

This is not to say that every admission of hearsay without objection is fundamental

---

**15.** The confrontation clause requires a two-step analysis for determining whether out-of-court statements admitted at trial comport with its concerns. First the declarant must be "unavailable." Second, the declarant's statements must bear an adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). Although we uphold the trial court's determination of unavailability for the reasons stated, *supra*, we do not find that the child's statements here fall within a "firmly rooted hearsay exception" or that they demonstrate "particularized guarantees of trustworthiness" required when using the "catchall" exceptions of the Rules of Evidence as discussed

*infra. Robinson*, 153 Ariz. at 204, 735 P.2d at 814; *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. Thus, where no exception to the hearsay rules exists, the determination of unavailability alone will not suffice to satisfy the requirements of the confrontation clause.

**16.** *Contrast, State v. Holder*, 155 Ariz. 83, 745 P.2d 141 (1987) wherein we held that the State's use of peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) had "no fundamental impact on the integrity of the fact-finding process."

error and requires reversal. Nor do we conclude that every admission of hearsay pursuant to § 13–1416 constitutes reversible error. However, there are circumstances, as we discussed in *Robinson,* where admission of hearsay under A.R.S. § 13–1416 would violate fundamental principles of the truth-seeking process. The present case is one such instance.

Because we extend the rationale of *Robinson* to the case at bar, the hearsay statements cannot be admitted pursuant to A.R.S. § 13–1416. However, as in *Robinson,* our review is not complete. If the statements offered were admissible under some recognized hearsay exception, the conviction may nevertheless be sustained.

In any discussion about hearsay exceptions and their applicability, it is necessary that the purpose of the hearsay rule and its exceptions be kept in mind. "Hearsay" is any out-of-court statement offered at trial to prove the truth of the matter asserted. Rule 801(c), Ariz.R.Evid., 17A A.R.S.[17] Hearsay is inadmissible under Rule 802.

The general rule prohibiting hearsay is based on the nature of our judicial system. The confrontation clause is vindicated through cross-examination. Cross-examination assesses the perception, memory, motivation, and sincerity of the declarant and "may reveal ambiguities in the declarant's use of language and errors in the report of the out-of-court statement." M. Udall & J. Livermore, *Law of Evidence* § 121, at 234 (2d ed. 1982).

Obviously, a statement made out-of-court cannot be subjected to rigorous examination the same way that in-court statements can. It is simply not possible to cross-examine hearsay. M. Udall & J. Livermore, *Law of Evidence* § 121, at 234. Furthermore, "[w]ithout the testing of cross-examination, it is often impossible to assess the weight reasonably to be attached to evidence." *Id.* Thus, the general bar against hearsay is a widely accepted and deeply rooted part of our jurisprudence.

Hearsay exceptions arose when "circumstantial guarantees of trustworthiness"

were present thereby reducing the need for cross-examination. *See* Fed.R.Evid. 803 advisory committee's note. In other words, statements made under certain circumstances speak for themselves and cross-examination of the declarant would not provide much in the way of understanding or assessing their value. In *State v. Jeffers,* 135 Ariz. 404, 421, 661 P.2d 1105, 1122 (1983), we stated:

> The primary concern of the confrontation clause is to assure that the jury has an adequate basis upon which to evaluate the truth of the statement. *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Cross-examination, although preferred, is not the sole method by which the confrontation clause may be satisfied. Absent cross-examination, the essential issue is whether under all of the circumstances, the hearsay statement has a high degree of reliability. *United States v. Nick,* 604 F.2d 1199 (9th Cir.1979).

The particular exceptions contained within Rules 803 and 804 are historically proven examples of when the need for cross-examination is diminished. Thus, if we find that the hearsay statements in the present case exhibit the proper degree of reliability, they may be admissible under the Rules of Evidence, and we may affirm the defendant's conviction despite the unconstitutionality of A.R.S. § 13–1416. *Robinson,* 153 Ariz. at 198–99, 735 P.2d at 808–09.

In a case involving child sexual abuse, we are more likely to find that the statements satisfy one of the narrow exceptions to the hearsay rule. *Robinson; State v. Ritchey,* 107 Ariz. 552, 490 P.2d 558 (1971). This is consistent with a flexible approach to the rules of evidence for meeting new and special problems in the courtroom, but this liberality should not be construed as a license to abandon rigorous examination and investigation of the proffered statements and the circumstances surrounding them. As the present case demonstrates, a case-by-case analysis will require an intensive factual inquiry at trial and upon appellate review. Nevertheless, we believe that

---

**17.** Hereafter the Arizona Rules of Evidence will be cited as Rule ——.

this method of determination offers a sensible and sensitive approach to balancing the rights of the accused with the special problems that arise in child sexual abuse cases.

■ In the present case, we are unable to find a firmly recognized exception which supports the admission of these statements. The record indicates that none of the statements offered against defendant involved statements made in the course of medical treatment. Thus, the statements are not admissible as statements made to further medical diagnosis or treatment under Rule 803(4). *Robinson,* 153 Ariz. at 199, 735 P.2d at 809.

The child's statements will not qualify under 803(2) as an excited utterance. This exception requires that the statement be made under the stress and excitement of a startling event. *State v. Rivera,* 139 Ariz. 409, 411, 678 P.2d 1373, 1375 (1984). Here, the statements were made more than two months after the alleged molestation.[18] The child's statements were not made in stressful circumstances but resulted from conversations initiated by her mother and later by the police. Thus, they were not spontaneous and will not qualify under this exception.[19]

We are unable to find any other specific exception remotely applicable to the present case. Nevertheless, many courts, including this one, have found Rules 803(24) and 804(b)(5) (the "residual hearsay exceptions") useful in these circumstances.[20] *Robinson,* 153 Ariz. 191, 735 P.2d 801. Except for the requirement that the declarant be unavailable under Rule 804(b)(5), these rules permit:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable effort; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.[21]

18. We consider lapse of time as only one factor in determining the admissibility of an excited utterance. *State v. Yslas,* 139 Ariz. 60, 676 P.2d 1118 (1984). The delay here is not dispositive but weighs heavily against the exception's applicability. *State v. Rivera,* 139 Ariz. at 411, 678 P.2d 1373 ("The time factor is probably the most important of the elements which enter into determination of this exception.").

19. *Contrast, State v. Ritchey,* 107 Ariz. 552, 490 P.2d 558 (1971) (Statements made by children shortly after returning home from visit with defendant were spontaneous and met requirements of the exception); *State v. Bauer,* 146 Ariz. 134, 704 P.2d 264 (App.1985) (wherein the victim of a molestation made her statements in response to questioning by her mother some 45 minutes after the incident, and were found admissible under 803(2)).

20. *See, United States v. Nick,* 604 F.2d 1199 (9th Cir.1979); *State v. Brown,* 341 N.W.2d 10 (Iowa 1983); *D.A.H. v. G.A.H.,* 371 N.W.2d 1 (Minn. App.1985); *M.N.D. v. B.M.D.,* 356 N.W.2d 813 (Minn.App.1984); *State v. Doe,* 94 N.M. 637, 614 P.2d 1086 (App.1980); *State v. Taylor,* 103 N.M.

189, 704 P.2d 443 (App.1985); *State v. Fearing,* 315 N.C. 167, 337 S.E.2d 551 (1985); *State v. Smith,* 315 N.C. 76, 337 S.E.2d 833 (1985); *State v. Hollywood,* 67 Or.App. 546, 680 P.2d 655 (1984); *Cf. W.C.L. v. People,* 685 P.2d 176 (Colo. 1984) (discussed residual exception approvingly but declined to adopt in light of statutory scheme).

21. Unavailability under § 13–1416 and 804(b)(5) have been treated identically. *Robinson,* 153 Ariz. 191, 735 P.2d 801 (1987). Since Cara was found unavailable under § 13–1416; 804(b)(5) is also satisfied.

Further, we believe the notice requirement under the residual exceptions was satisfied in the present case. The state filed a motion to allow in the hearsay statements pursuant to A.R.S. § 13–1416. The statute itself has language virtually identical to the notice provisions under 803(24) and 804(b)(5). Thus, defendant's counsel was aware that the state intended to use the statements at trial. Defendant therefore had sufficient opportunity to prepare to meet the statements. *See United States v. Carlson,* 547 F.2d 1346, 1355 (8th Cir.1976) (purpose of no-

The child was found to be unavailable, so her hearsay statements are, therefore, properly analyzed under Rule 804(b)(5). To be admissible under this exception, we must determine whether these statements have "equivalent circumstantial guarantees of trustworthiness." [22]

In determining what constitutes "equivalent circumstantial guarantees of trustworthiness," we consider the reliability of the evidence "in light of all the circumstances." *Robinson,* 153 Ariz. at 201, 735 P.2d at 811; *State v. Robles,* 135 Ariz. 92, 94–5, 659 P.2d 645, 647–48 (1983). Whether the circumstances surrounding the statements strongly suggest that the matters asserted are particularly trustworthy, are dependent upon, *inter alia,* the spontaneity, consistency, knowledge, and motives of the declarant and witnesses to speak truthfully. *Robinson,* 153 Ariz. at 201–02, 735 P.2d at 811–12. Statements that have been admitted in the past have had these common *Robinson* threads. *See,* M. Udall & J. Livermore, *Law of Evidence* § 126 (2d ed. 1982). Other jurisdictions have considered them important when searching for a justification for using a hearsay statement. *See United States v. Nick,* 604 F.2d 1199, 1204 (9th Cir.1979); *State v. Brown,* 341 N.W.2d 10, 14–15 (Iowa 1983); *D.A.H. v. G.A.H.,* 371 N.W.2d 1, 3 (Minn.App.1985); *M.N.D. v. B.M.D.,* 356 N.W.2d 813, 818 (Minn.App.1984); *State v. Taylor,* 103 N.M. 189, 197, 704 P.2d 443, 451 (App.1985); *State v. Doe,* 94 N.M. 637, 638, 614 P.2d 1086, 1087 (App.1980); *State v. Hollywood,* 67 Or.App. 546, 551, 680 P.2d 655, 658 (1984); *Matter of G.P.,* 679 P.2d 976 (Wyo. 1984). Those states that have a child hearsay statute similar to A.R.S. § 13–1416 have also looked at similar factors in assessing the reliability of the statements. *See State v. Myatt,* 237 Kan. 17, 26, 697 P.2d 836, 843 (1985); *State v. Ryan,* 103 Wash.2d 165, 175–76, 691 P.2d 197, 205 (1984); *State v. Slider,* 38 Wash.App. 689, 697–98, 688 P.2d 538, 543 (1984).

The statements of the child Cara were not spontaneous. They were the result of a conversation initiated by Cara's mother after a therapy session. The facts indicate that the child was being encouraged to reflect and report any previous molestation. "If there is evidence of prior interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness." *Robinson,* 153 Ariz. at 201, 735 P.2d at 811. The circumstances of the conversation with her mother negate any idea of spontaneity. The factor of spontaneity must be eliminated as a factor supporting trustworthiness of the statements.

The child's statements appear to be consistent. What she told her mother and what she told the police did not differ significantly. However, "consistency does not always guarantee trustworthiness; it could be evidence that the statements were rehearsed." *Robinson,* 153 Ariz. at 201, 735 P.2d at 811. The record does not indicate any premeditation on the child's part. However, her statements to the police were *not* in response "to normal, nonleading questions." *Id.* The consistency of the statements in this case lend some weight to their truthfulness, but not sufficient weight to be a deciding factor guaranteeing trustworthiness.

tice requirement is to give adverse party adequate time to prepare to contest use of the statement), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *Robinson,* 153 Ariz. at 202, 735 P.2d at 812.

Nor can it be disputed that the statements are evidence of a material fact and prove more probative than any other evidence offered by the state. Both the *corpus delecti* and the identity of the perpetrator are established solely through Cara's statements. Since Cara was herself unable to testify, the necessity of admitting her statements was greatly enhanced. Thus, we need only address the two remaining requirements—are the statements trustworthy and would their admission serve the interests of justice?

**22.** Furthermore, because Cara is unavailable and her statements do not fall within a "firmly rooted" hearsay exception, these statements are presumed constitutionally inadmissible under the confrontation clause unless they bear "particularized guarantees of trustworthiness." *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608; *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514, 528 (1986); *See also,* Goldman, *Not So "Firmly Rooted": Exceptions to the Confrontation Clause,* 66 N.C.L.Rev. 1, 8 (1987).

Both the present case and the *Robinson* case had expert testimony regarding the likelihood that a child of Cara's age would have the particular knowledge of intimate sexual acts as described in the hearsay statements. The child in *Robinson* expressed knowledge far and above that of a child of like age. Thus, we could comfortably conclude that the *Robinson* child derived her knowledge from the incident itself. *Robinson*, 153 Ariz. at 201, 735 P.2d at 811.

Similar circumstances in the present case might allow us to draw the same conclusion, but Cara's knowledge of intimate sexual acts do not "give her statements the ring and quality of truth" found in the *Robinson* case. *Id.* While the child in *Robinson* had no previous history of sexual abuse and could only have received her knowledge from the incident, Cara could have received her knowledge from other sources.

As the record indicates, the state's experts believed that Cara was molested by her father. Suspicion first arose during the play evaluation. At that time, the defendant had not yet met Cara. This suspicion was sharpened after the "group socialization." Not only did Cara make statements about being touched in wrong places while her father was around, her father also showed her "nasty pictures." *See Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988) (graphic description of what occurred between defendant and alleged victim could be explained by the latter's perusal of sexually explicit magazines). In addition, the mother testified that during the kidnapping, Cara's father had a girl living in the van with them. Thus, Cara was probably exposed to adult sexual acts.

But Cara's father was not the only possible source of her knowledge. Cara's knowledge of intimate sexual acts is also demonstrated by her allegations against Chris[23] and Robbie.[24] Furthermore, Cara not only knew about masturbation but used

street language to describe it. *Ante* at 168, 755 P.2d at 1156. There is no evidence that such information or descriptive language came from the defendant. In fact Cara never accused the defendant of masturbating in front of her. The knowledge of sexual matters possessed by Cara cannot be ascribed only to her contact with the defendant.

The state contends that none of these other incidents involve what occurred with the defendant, and the sole source of Cara's knowledge derived must be from the incident with the defendant. We are unable to draw this conclusion with the necessary degree of trustworthiness required by the residual hearsay exceptions. The state's experts stated unequivocally that the child had already been molested, but they were unable to provide any definite information about the nature of that prior molestation. In addition to the experience with her father, the record discloses several other possible sources from which the child may have obtained sexual knowledge and experience. To ignore these sources or their implications would result in our assessing the record in a vacuum. It would result in overvaluing the hearsay statements by failing to analyze them "in light of all the circumstances." *Robinson*, 153 Ariz. at 201, 735 P.2d at 811.

In contrast to the *Robinson* case, we find here the child's advanced knowledge of sexual matters cannot be solely attributed to the alleged incident between her and the defendant. This negates the reliability that such knowledge ordinarily provides.

Next, we consider whether there were any illicit motives on the part of any of the witnesses to lie about the statements or to mislead the jury. Apart from Cara, there is no evidence in the record to support any inference of any improper motivation on the part of the witnesses. However, the defendant contends that the child did not like him. This contention is supported by the mother's testimony.[25] Furthermore,

23. *See supra* note 2.

24. *See supra* note 6.

25. Initially, Cara and the defendant appeared to have a good rapport. It was not until the spring of 1985 that Cara expressed any animus towards the defendant. Cara questioned her mother's interest in the defendant both before and after

Cara was aware that her mother and the defendant had spent the night together two weeks prior to her making the statements at issue. The record also shows that Cara voiced her dislike of the defendant at the May 20 therapy group. Finally, Cara's therapists testified that Cara was generally hostile towards men due to her father's prior abuse.

The inference that the defendant would like us to draw from these facts is that Cara may have harbored enough ill-will toward him to fabricate a story designed to discredit him. We hesitate to attribute such ill-will or design to the child's actions. It is a matter of speculation whether her dislike for the defendant came from the alleged act, simple jealousy or a general hostility towards men. Nevertheless, this evidence has a tendency to show that Cara was not without improper motivation in her accusations against the defendant. *See State v. Bohnert*, at 659 (victim's jealousy of her mother's relationship with defendant and fear that he might take her mother away, sufficient to show improper motivation for accusation).

Although the statements here failed to show any reliability sufficient to require us to look further to the corroborative evidence, we do so because the Court of Appeals found sufficient corroboration based upon the following:

> [Cara's] statement that she had already been molested was unsolicited and tends to corroborate the molestation. In addition, it was uncontradicted that the defendant did babysit her at his apartment. There was also expert testimony by the victim's therapist, who had had an opportunity to observe her in frequent sessions, that the child had been sexually abused. Finally, on the day the victim told her mother about the sexual abuse, her mother called the defendant on the telephone. When she told him that the child had accused him of molesting her, the defendant did not deny the allegations but only stated "Oh, fuck." We

believe these factors and circumstances provide the corroborative evidence required by the statute.

We have examined the extent of corroboration of the testimony in determining its admissibility. *Robinson*, 153 Ariz. at 202, 735 P.2d at 812. We do not require corroboration under the residual hearsay exceptions, but its existence is nevertheless helpful. *Id.* A.R.S. § 13–1416 required corroboration when the hearsay declarant was unavailable. *See* note 8, *supra*.

■ There exists some dispute whether analysis under the residual exceptions allows us to consider corroborative evidence at all in support of the statements' admissibility. Some courts have flatly stated that "The probability that the statement is true, as shown by corroborative evidence, is not, we think, a consideration relevant to its admissibility under the residual exception to the hearsay rule." *Huff v. White Motor Corp.*, 609 F.2d 286, 292 (7th Cir.1979); *accord State v. Ryan*, 103 Wash.2d 165, 174, 691 P.2d 197, 204 (1984).

We believe, however, the better view is to the contrary and supported by a majority of jurisdictions. *See* n. 20, *supra*. *Also see United States v. Bailey*, 581 F.2d 341 (3rd Cir.1978); *Robinson*, 153 Ariz. at 202, 735 P.2d at 812. The residual exceptions permit statements exhibiting "equivalent circumstantial guarantees of trustworthiness." Trustworthiness may be shown in a variety of ways. Nothing in the residual exceptions themselves, or the hearsay rules generally, prohibit the use of corroborative evidence in assessing reliability. Corroborative evidence makes a statement more reliable because it increases the likelihood that the statement is true. *See Huff*, *supra*. Thus, we consider corrorobative evidence to be relevant to the residual hearsay exceptions.

This is not to say that corroborative evidence is either a necessary or sufficient condition to admissibility under the residual

---

her mother and the defendant spent the night together. Cara's queries concerned why her mother wanted to see the defendant and why she liked him. In addition, Cara would get

angry when the defendant would come over. Cara's mother attributed this behavior to jealousy until Cara made her statements in the car.

exceptions. It is neither. Such evidence is useful only when the statements exhibit some degree of reliability in the first instance, *i.e.* in the circumstances in which the declarant made the statements. *See State v. Taylor,* 103 N.M. 189, 199, 704 P.2d 443, 453 (App.1985) (corroboration evidence alone will not lend particular trustworthiness to the child's statements); *State v. Slider,* 38 Wash.App. 689, 694, 688 P.2d 538, 543 (1984) (same). *See also, State v. Ryan,* 103 Wash.2d 165, 172, 691 P.2d 197, 204 (1984) ("Adequate indicia of reliability must be found in reference to circumstances surrounding the making of the out-of-court statement, and not from the subsequent corroboration of the criminal act."). Corroborative evidence may then be used to "bolster" the reliability to the level sufficient to satisfy the residual exceptions. *Robinson,* 153 Ariz. at 202, 735 P.2d at 812.

■ Corroboration may be established in a variety of ways as illustrated by the cited cases. *United States v. Nick, supra* (physical evidence of crime, defendant's confession, opportunity to commit crime); *Robinson,* 153 Ariz. at 202, 735 P.2d at 812 (physical evidence, other witness, victim's behavioral changes); *State v. Brown, supra* (Larson, J. dissenting) (statements admissible under "excited utterance" exception corroborate the challenged hearsay, physical evidence, defendant's admission); *D.A.H. v. G.A.H., supra* (expert testimony, child's unusual and sexualized behavior); *M.N.D. v. B.M.D., supra* (abnormal behavior of child); *State v. Taylor, supra* (physical evidence, defendant's possession of an instrumentality); *State v. Hollywood, supra* (other witness); *State v. Myatt, supra* (physical evidence, expert testimony); *State v. Ryan, supra* (defendant's confession, physical evidence, opportunity); *State v. Slider, supra* (physical evidence, defendant's confession). Thus, to be corroborative, the evidence must be separate and apart from that already given and tend to strengthen or confirm the matter corroborated. *State v. Kennedy,* 122 Ariz. 22, 26, 592 P.2d 1288, 1292 (App.1979) ("Corrobo-

rative evidence tends to corroborate or to confirm, whereas cumulative evidence merely augments or tends to establish a point already proved by other evidence."); *See also Huff,* 609 F.2d at 292 ("The probability that the statement is true ... [is] shown by corroborative evidence.")

■ No physical evidence, marks, injuries, etc., were produced in support of Cara's statements. Nothing in the record shows Cara displayed any marked behavioral changes after she had stayed with the defendant. Admittedly, Cara told her mother that she did not like the defendant but these statements occurred several months after the alleged incident and at a time when the defendant and her mother had become increasingly intimate. In addition, her dislike of the defendant is fully consistent with her general hostility towards men displayed long before she met the defendant.

We also disagree that the evidence cited by the Court of Appeals constitutes sufficient corroboration. To begin with, even if we were to assume that Cara's statement in the car was unsolicited, this has to do with its circumstantial reliability and does not constitute corroboration. In any event, as already discussed, Cara's statements in the car and to the police were not unsolicited.

We find no independent significance in the fact that the defendant was with Cara at his apartment. We recognize that this evidence shows opportunity to commit the crime but this hardly serves to provide corroboration.

The therapist's testimony that Cara had been sexually abused adds little to corroborate Cara's statements to her mother and the police. Cara was already being observed for signs of sexual abuse prior to her statements regarding the defendant. Thus, the expert's conclusion that the child had been sexually abused, does not tend to strengthen or confirm the child's statements specifically regarding the defendant.[26]

---

**26.** As we have noted above, some of the expert

testimony used to support the allegations made

The Court of Appeals was satisfied that the defendant's response to Cara's mother was an admission. The mother had stated to the defendant that she wanted to discuss "Something you shouldn't have done to a little girl." The defendant's expletive, in reply to her ambiguous accusation, is also ambiguous. At trial neither the prosecution nor defense inquired about what the defendant meant by his remark. We conclude that the matter is too ambiguous to be considered corroboration.

From our review of the record and the legal authorities, we conclude that none of the recognized exceptions to the hearsay rule permitted the admission of the hearsay statements of the child, Cara. Cross-examination in this case is essential to test the reliability of Cara's statements. She has identified at least three people (Chris, Robbie, and the defendant) who have or attempted to molest her. The child's life with her father has exposed her to matters not normally experienced by children her age. Cross-examination could produce information from which the jury could conclude whether the child's testimony is trustworthy. Cara, rather than her therapists, could explain what her drawings meant. We might be able to understand why Cara took so long to tell what happened. In essence, the value of cross-examination here is immeasurable. Instead, statements by third parties prevented the defendant from testing the source and developing the facts regarding the alleged act itself, the victim's motivations, the meaning of her statements, etc. In depriving the defendant of the opportunity to cross-examine his accuser, the defendant was deprived of his right of confrontation of witnesses, a right protected by the state and federal constitutions.

The admission of the hearsay statements of the child was error, and it was fundamental error. The decision by the Court of Appeals is vacated, the conviction reversed, and the case is remanded for a new trial.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.

in the statement by Cara were determined by this court to be inadmissible under the *Lindsey* and *Moran* decisions. While the resolution of the hearsay issue disposes of this appeal, on retrial, the issue of admissibility of this testimony may recur. Since this case was pending on direct review when *Lindsey* and *Moran* were decided, prospective application of those decisions will prohibit the introduction of this testimony upon retrial. *State v. Nunez,* 135 Ariz. 257, 660 P.2d 858 (1983).